# CASES

## ARGUED AND DETERMINED

### IN THE

## CIRCUIT COURTS OF APPEALS AND DISTRICT COURTS OF THE UNITED STATES, UNITED STATES COURT OF CUSTOMS AND PATENT APPEALS, COURT OF CLAIMS OF THE UNITED STATES, AND COURT OF APPEALS OF THE DISTRICT OF COLUMBIA

**BENNETT v. UNITED STATES.**

No. 5769.

Circuit Court of Appeals, Fifth Circuit.

May 27, 1931.

See, also, 36 F.(2d) 475.

Bart A. Riley and Vincent C. Giblin, both of Miami, Fla. (W. E. Walsh, of Miami, Fla., on the brief), for appellant.

W. P. Hughes, U. S. Atty., of Jacksonville, Fla., and S. R. Rush and John S. Pratt, Sp. Assts. to Atty. Gen.

Before FOSTER, Circuit Judge, and HUTCHESON and SIBLEY, District Judges.

FOSTER, Circuit Judge.

Appellant, Frank A. Bennett, was convicted on nine counts of an indictment charging the unlawful mailing of certain letters in furtherance of a fraudulent scheme. Two other persons were named in the indictment, one of whom was acquitted and the other has not appealed. Error is assigned to the denial of a motion for a directed verdict at the close of the evidence.

It is not disputed that the letters were mailed as charged, but good faith is relied upon. As to the fraudulent character of the scheme, there was evidence tending to show the following state of facts: Appellant, who was then known as David Kramer Gratz, which name was later changed by a judgment of court to Frank Andrew Bennett, purchased from one Hardesty a tract of land known as the John Bunch grant in Volusia county, Fla., for the price of $200,000. The tract contained some 1,285 acres and at that time it was assessed for taxation at $10,000. He was credited with $10,000 as commission, and he paid $12,000 in cash. The remaining $178,000 was represented by a first mortgage payable in ten annual installments. In May, 1925, a company known as the Dixie Bay Shore Realty Company was incorporated with an authorized capital of $3,000,000, $1,500,000 common stock and an equal amount of preferred stock. The real estate acquired by Bennett from Hardesty was transferred to this company. The ostensible purchase price was $907,000 and the entire issue of common stock. Of this $300,000 was to be paid to Bennett in installments of $50,000 per month, the company assumed Bennett's mortgage to Hardesty of $178,000, and in addition executed a second mortgage for $429,000. The entire common stock, which had the sole voting power of the company, was transferred to Bennett and his associates. Later on, two other corporations were created, one the F. A. Bennett Company, Inc., and the other the F. A. Bennett, Inc., the only difference in name being the word "company." A contract was made with the first named to sell the preferred stock of the Dixie Company on a commission of 20 per cent. and with the second company to sell the lots on commission of 10 per cent. These three companies were dominated by Bennett. Bennett also transferred to the Dixie Company another piece of land adjacent to the Bunch tract, containing 370 acres, at $700 per acre. The property was divided into 6,000 lots and was put upon the market at prices varying from $1,000 to $2,000 per lot. The preferred stock was offered to the pub-

lic at par, and, in order to induce the purchase, premiums of from 25 to 50 per cent. in common stock and real estate certificates, equal to the amount purchased, which could be applied on the purchase of lots, were offered. Representations were made that 20 per cent. of the sales price of lots would be set aside for that purpose, and that the preferred stock would be redeemed at 105, with cumulated interest of 8 per cent. per annum, and also that if any stockholder became dissatisfied with his investment, the company would refund his money. Representations were made that the purchase price of the property was in excess of $1,000,000. The fact that it was burdened with mortgages aggregating $507,000 was not disclosed. In order to sell the lots, an elaborate plat was made showing streets and sidewalks, bridle paths, tennis courts, a golf course, a yacht basin and pier, and other improvements, and representations were made that the tract was being developed as a subdivision, to be called Ormond-on-the-Bay; that the work of development was going forward, and that it would have all the improvements necessary to a city, the lot purchasers not to have to pay for any improvements. Some work of a superficial character was done, such as dredging a canal and filling some of the lots, but the improvements never progressed to a point where they had any practical value. While this cost approximately $90,000, the testimony of the engineer in charge was to the effect that an expenditure of a minimum of $1,800,000 would be necessary in order to complete the improvements designated, and three years would be required to do the work. Even with the work done, the land is wild and swampy and of little or no value for any purpose. This was known to Bennett at the time representations were being made to the public. The Florida boom was in full bloom at that time and the preferred stock was over subscribed. A number of lots were sold. Some of the oversubscriptions were returned, but no dissatisfied stockholder received his money back, although a number demanded it.

In round figures the Dixie Company received from the public $1,229,000, for the sale of lots and preferred stock. Of this Bennett, in addition to $765,000 of the common stock and about $100,000 of preferred stock, received $592,300. The two Bennett companies received $352,800, leaving approximately $374,000 to retire a mortgage of $178,000, with interest, to pay salaries and other expenses and to make promised improvements on the land that would cost upwards of $2,000,000, to say nothing of the fund of 20 per cent. that was to be set aside to retire the preferred stock.

It is evident that the public got practically nothing for its investment and was induced to buy both stock and lots by grossly false representations as to the cost of the property and its present value. The sale from Bennett to the Dixie Company was really a simulation, and the value of the Bunch tract could not be fixed higher than $200,000. with the value of the 370 acres at approximately the same per acre, not over $60,000. It is also evident that the representations as to the improvements to be made were knowingly false. It is also evident that Bennett knew there was no probability of creating a fund to retire the preferred stock or to return the money to dissatisfied investors. There are other facts appearing in the record tending to show other fraudulent representations, but we need not review them. We entertain no doubt that the jury was justified in concluding that the scheme was intended to be fraudulent, was in fact fraudulent, and that the investors were deceived by false representations to induce them to part with their money.

Other errors are assigned, but they are without merit.

The record presents no reversible error.

Affirmed.